Marion DAVIS, Plaintiff-Appellant,

v.

MARATHON OIL COMPANY,
Defendant-Appellee.

No. 75–1037.

United States Court of Appeals,
Sixth Circuit.

Argued April 22, 1975.

Decided Dec. 12, 1975.

Rehearing Denied Feb. 12, 1976.

Thomas F. Bryant, Hinton, Noble & Bryant, Richard A. Betts, Findlay, Ohio, for plaintiff-appellant.

Robert Gosline, Shumaker, Loop & Kendrick, Rolf H. Scheidel, Toledo, Ohio, for defendant-appellee.

Before CELEBREZZE, PECK and McCREE, Circuit Judges.

McCREE, Circuit Judge.

This appeal from an order granting Marathon Oil Company's motion for judgment *n. o. v.* presents two questions for review: (1) whether the district court erred in holding that reasonable minds could not have found that Marathon Oil Company violated either section 1 of the Sherman Act,[1] 15 U.S.C. § 1, or section 3 of the Clayton Act, 15 U.S.C. § 14,[2] in cancelling appellant's service station lease, and, (2) whether the district court erred in refusing to permit the testimony of five witnesses "discovered" by appellant only three days before trial despite Marathon's eight month old request for a list of all prospective witnesses. We hold that the district court did not err in entering judgment *n. o. v.,* and that it did not abuse its discretion in refusing to admit the testimony of five witnesses disclosed to Marathon only three days before trial.

Marion Davis, plaintiff-appellant, commenced this action on December 29, 1971, in the United States District Court for the Northern District of Ohio. The complaint charged that Marathon had violated sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act by, *inter alia,* "impos[ing] upon its hundreds of lessee-dealers exclusive dealing arrangements which required that the dealers secure their entire requirements of petroleum products and tires, batteries and other automobile accessories exclusively from the defendant . . . ."[3]

Nearly two years later, the case went to trial before a jury, and proofs were

1. Section 1 of the Sherman Act provides in relevant part:

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

2. Section 3 of the Clayton Act provides:

   It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

3. The complaint continues:

   These contracts and agreements are forced upon service station operators against their desires and are enforced by employees or agents of the said defendant, who constantly watch the products which are sold by the dealers. The service station operator knows that his lease will not be renewed at the end of the one-year-period, should he refuse to follow dictated prices or exclusive dealing arrangements of the defendant.

   7. Marathon has informed its retail dealers, including the plaintiff, that they are required to buy the T. B. A. brand items handled by Marathon in preference to any other and that they must buy such T. B. A. items from Marathon exclusively. These requirements were not reduced to writing, but are commonly made orally by Marathon representatives who visit the dealers. The representatives inspect the dealers' stations for competing merchandise and merchandise purchased from distributors other than Marathon—often requiring that such be returned, if found and threaten non-renewal of an offending dealer's lease. The tying arrangements are imposed as a matter of general practice, and therefore affect a substantial volume of T. B. A. sold by Marathon dealers.

submitted from September 24 until October 4, 1973. On September 21, Davis attempted to amend the list of his prospective witnesses that had already been submitted to Marathon by adding five witnesses—two Marathon dealers, his former employee, and two Marathon employees. Marathon moved to preclude the testimony of these additional witnesses and, after argument, the court granted the motion. At the conclusion of appellant's case and again at the conclusion of all the proofs, Marathon moved for a directed verdict. The district court denied the motion. The case was thereupon submitted to the jury upon proper instructions, and it returned a verdict for Davis. Judgment on the verdict was entered on December 1, 1973.

Shortly thereafter, Marathon moved for a judgment *n. o. v.* or, in the alternative, for a new trial, and the district court entered an order granting the motion for judgment *n. o. v.,* dismissing the action, and assessing costs against Davis. In its memorandum opinion, the district court stated that "there was not a scintilla of evidence" to support the jury's verdict. It held, to the contrary, that the evidence demonstrated that Marathon did not require its service station lessees to purchase tires, batteries and accessories (TBA) as a condition of receiving gasoline or of retaining their leases; that Davis purchased TBA from whomever he pleased; and that Davis' lease was terminated because he had been neglecting his service station to pursue other business interests with the consequence that the quality of services at the station deteriorated and it became unprofitable.

Appellant contends that the evidence was sufficient to permit reasonable persons to find that Marathon had impermissibly tied sales of gasoline to the lessee-operators of its service stations to sales of its TBA. Our examination of the record, however, demonstrates that although the complaint contained allegations of antitrust violations sufficient to withstand a motion to dismiss, appel-

lant's evidence would not permit a reasonable person to find that these allegations had been proved.

■ "Tying arrangements" have been defined as "agreements under which the vendor will sell one product only if the purchaser agrees to buy another product as well." *Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55, 60 (4th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). An illegal tie-in arrangement need not be expressed in a written contract, but the complainant must show that the seller would not make available to a purchaser one commodity unless the purchaser agrees to buy another. *Advance Business Systems & Supply, supra; Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 467–68 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *McElhenney v. Western Auto Supply Co.,* 269 F.2d 332, 338 (4th Cir. 1959).

■ A tie-in arrangement may violate either section 3 of the Clayton Act or section 1 of the Sherman Act. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Advance Business Systems & Supply Co., supra.* The standards of illegality under the two statutes are similar. The Clayton Act makes it unlawful for a person engaged in commerce to make a sale or contract for the sale of goods on the "condition, agreement, or understanding" that the "purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessee or seller, *where the effect* of such . . . sale, or contract for sale or such condition, agreement or understanding *may be to substantially lessen competition or tend to create a monopoly in any line of commerce."* 15 U.S.C. § 14. [Emphasis added.]

In *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (footnote omitted), the Supreme Court stated a similar standard under the Sherman Act:

Indeed "tying agreements serve hardly any purpose beyond the sup-

pression of competition." *Standard Oil Co. of California and Standard Stations v. United States,* 337 U.S. 293, 305–306 [69 S.Ct. 1051, 1058, 93 L.Ed. 1371]. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons "tying agreements fare harshly under the laws forbidding restraints of trade." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 606 [73 S.Ct. 872, 879, 97 L.Ed. 1277]. *They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of interstate commerce is affected. International Salt Co. v. United States,* 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20]. Cf. *United States v. Paramount Pictures,* 334 U.S. 131, 156–159 [68 S.Ct. 915, 928–929, 92 L.Ed. 1260]; *United States v. Griffith,* 334 U.S. 100 [68 S.Ct. 941, 92 L.Ed. 1236]. Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most.

In light of these standards, we consider whether there was sufficient evidence presented in this case to permit reasonable minds to conclude: (1) that Marathon violated the Sherman Act by having sufficient economic power to appreciably restrain free competition and imposing upon its lessee-operators a tying arrangement that restrained a "not insubstantial" volume of interstate commerce, or (2) that Marathon violated the Clayton Act by a tying agreement that tended to "substantially lessen competi-

tion" or "create a monopoly in any line of commerce."

## THE PROOFS SUBMITTED AT TRIAL

For the five years before August 1966, Marion Davis was a lessee-operator of Pure Oil Company service stations in Findlay, Ohio. In addition to selling oil products, he operated a trailer and truck rental service and a vehicle washing service, performed motor tune-ups, brake repair, muffler and tail pipe replacements, and sold tires, batteries, and replacement automobile and truck parts.

In July 1966, Marathon Oil Company representatives asked Davis to assume operation of the College Marathon Service Station in Findlay. As a condition of becoming a Marathon lessee, Davis was required to purchase the station inventory that had been ordered but not sold by his predecessor. Davis cancelled his lease with Pure Oil and assumed operation of the Marathon station on August 22, 1966. The Marathon lease, signed four days later, was a standard year-to-year contract containing the usual 30 day termination provision that either lessor or lessee could exercise. It was renewed annually in 1967, 1968, and 1969 until Marathon exercised its right to cancel in 1970.

From 1966 to 1970, Marathon marketed its petroleum products and its sponsored TBA brands primarily in Wisconsin, Michigan, Illinois, Ohio, Kentucky and Florida. The Marathon "Ohio Region" included the entire state of Ohio, a portion of Kentucky, and a part of interstate highway "I–75," from Ohio through Florida. Marathon had over one thousand stations in Ohio, where it ranked either second or third in sales of branded gasoline. Approximately ninety percent of Marathon service stations were owner-operated.

During the four year period in question, Marathon sold to its dealers at wholesale prices certain brands of tires, batteries and accessories (TBA). It sold both "B. F. Goodrich" and "Firestone" tires, sponsored "Delco" batteries, and

made available to its dealers accessories normally stocked by service stations including "Fram" air and oil filters, "Anco" windshield wiper blades, "Champion" spark plugs, "B. F. Goodrich" fan belts, radiator hoses, shock absorbers, sealed beam headlamps, and automobile light bulbs.

Marathon encouraged its TBA sales by offering its dealers special promotions, discounts and other incentives, including a bonus rebate from seven to ten percent of his total annual TBA purchases.

Marathon did not provide its dealers with replacement parts not ordinarily stocked by service stations including, for example, mufflers, tail pipes, water pumps, generators, alternators, regulators, gaskets, wheel bearings, hydraulic parts, brake shoes, and ignition parts. When necessary, a dealer ordered these parts from automotive suppliers whose primary business was not the sale and distribution of petroleum products.

During the period in question, there were three major automotive equipment suppliers in the Findlay area: Sparton Distributing Company, Inc., The Ohio Automotive Supply Company, and Steele's Automotive, Inc. The record does not show that Davis made any purchases from Steele's either while he was a Pure Oil dealer or while he was a Marathon dealer. It does show, however, that although he purchased almost nothing from Sparton when he was a Pure Oil dealer, he made substantial purchases from Sparton after he became a Marathon dealer. For example, from January through July 1966, Davis purchased $12.15 worth of goods from Sparton. From August until December 1966, while Davis was operating the College Marathon station, he purchased $1,640.79 worth of goods from Sparton. His annual battery and accessory purchases from Sparton totaled $2,447.53 in 1967, $3,439.32 in 1968, $2,733.03 in 1969, and $5,321.30 in the first eight months of 1970. Davis' battery and accessory purchases from Marathon totaled $2,897 in 1967, $3,416 in 1968, $3,707 in 1969, and $1,662 in the first eight months of 1970.

In addition, each year during which he operated the College Marathon station, his purchases from Marathon were approximately $1,000 less than his purchases from Ohio Automotive Supply.

There was no significant difference between Davis' acquisition and sale of Marathon TBA and his acquisition and sale of Ohio Distributing and Sparton TBA. Sales representatives from Sparton, Ohio Distributing, and Marathon visited his station each week to check inventories, to determine his needs, and to prepare orders for goods. Sometimes Davis did not even sign the orders because he relied on the sales representatives to determine his needs. He displayed the supplies purchased from Sparton and Ohio Distributing in the same manner as the supplies purchased through Marathon. In describing how he ordered his TBA, Davis testified that he purchased TBA from whomever he wanted.

The evidence also disclosed that the other nine Marathon station lessees in Findlay purchased batteries and accessories from both Ohio Automotive and Marathon. Five of them purchased a greater dollar amount of these items from Ohio Distributing than they did from Marathon. Moreover, five dealers also testified that although they bought their TBA primarily from Marathon when available, they had never been required by Marathon to purchase these items exclusively from it.

In order to show that Marathon imposed upon its hundreds of service station lessees an illegal arrangement tying the sale of its sponsored TBA items to the sale of its petroleum products, Davis relied primarily upon four incidents.

The first incident occurred approximately two months after Davis took over the Marathon station. On October 11, 1966, appellant ordered 15 "Delco" batteries from Sparton. He testified that he returned the batteries three days later because James Day, the Marathon sales representative, had instructed him to do so. Then, pursuant to the Marathon representative's order, on October

17, B. F. Goodrich Company shipped and billed to appellant 15 identical "Delco" batteries, charging an average of two dollars less per battery than Sparton's price. Whatever the significance of this event, the record discloses also that Davis made four additional purchases of "Delco" batteries from Sparton during the same month.

The second incident occurred four years later in February 1970. Day's successor as the Marathon representative, Gary Burocker, ordered some TBA, including a quantity of obsolete air filters, for appellant without obtaining his signature. When appellant returned them, Burocker visited the station the same day to inquire about them, and told appellant that he should have accepted the order. It does not appear that anything further occurred in connection with this incident.

The third and fourth incidents relied upon by appellant to show an illegal tying arrangement occurred in 1970, when appellant purchased shock absorbers and tires from Sparton and Buckeye Distributing Company. Burocker told him about that time that his lease might be cancelled unless he purchased more TBA from Marathon.

After October 1966, Davis testified that he made no large purchases from other suppliers of items offered for sale by Marathon until March 1970 when he purchased $752 worth of shock absorbers from Sparton and twelve tires from Buckeye Distributing Company.

During the same month, March 1970, that Davis made the purchases from Buckeye and Sparton, the Marathon district manager sought permission from his superiors to cancel Davis' lease for the stated reasons that for six months he had operating and volume problems, that his station was dirty, that he was unwilling to accept advice from Marathon representatives, that his sales of gasoline were declining and that his sales of Marathon-sponsored TBA were insufficient. When Davis learned of the proposed cancellation from a Shell Oil Company representative, he contacted an attorney.

The attorney advised Marathon of Davis' inclination to bring an antitrust suit against it charging that it had tied its sales of gasoline or the leasing of its stations to sales of its TBA. Shortly thereafter, the Marathon district manager wrote two memoranda to his superiors, one outlining the procedure to be followed in cancelling Davis' lease in accordance with the terms of the lease agreement, and the second listing the brands of TBA stocked by Davis and the names of the suppliers.

On June 15, 1970, Marathon notified Davis that his lease would be cancelled on August 31, 1970, and on that date, Marathon took possession of the station.

This evidence, even when construed most favorably to Davis, does not permit a finding that Marathon tied its sales of petroleum products to appellant to his purchases of its TBA, or that continuation of his lease was conditioned upon the purchase of TBA exclusively from Marathon. There is no evidence in the record that Marathon refused at any time during the four year period to supply Davis' requirements of petroleum products. And there is insufficient evidence to permit a determination that Davis' lease was cancelled because he refused to purchase Marathon-sponsored TBA in preference to the TBA sold by other suppliers.

Of the four incidents relied upon by appellant to show Marathon's liability, the first two offer no support for his position. The 1966 incident concerning the "Delco" batteries shows only that the Marathon sales representative convinced appellant to return 15 batteries which were then reordered from Marathon at a savings of $2 per battery. The 1970 incident concerned the unordered air filters. However, after Burocker's initial pique when appellant returned the unordered and obsolete TBA, nothing more appears to have come from the incident.

The last two incidents concerned Burocker's complaint in 1970 about the low volume of appellant's TBA sales and Burocker's intimation that this could result

in the loss of the lease. This evidence is as consistent with Marathon's claim that appellant was neglecting the station and losing business as it is with appellant's allegations about a tying arrangement. Significantly, no express threats to cancel the lease were made by the salesmen and there was no communication from any other Marathon employee or officer.

But more importantly, as the trial judge emphasized:

> Although plaintiff testified that in 1969 he started buying more TBA from others, and this led to the cancellation of his lease, the documentary evidence showed that in fact plaintiff had increased his TBA purchases from defendant in 1969.

The defendant's evidence showed that in the last year of his lease, plaintiff was devoting much of his time to other business interests which he had; that gasoline sales at the station had fallen off markedly; that the housekeeping at the station was very poor; and that the plaintiff was tying up the service bays at the station by doing heavy repair work of the type which is not appropriate for a full-service gasoline station. Plaintiff was warned about these findings, but seeks to excuse or minimize them, and to convert the warnings into threats that would be in violation of the antitrust laws.

However, even if Davis had shown that Marathon had required him to purchase Marathon TBA in order to retain his lease and to purchase Marathon petroleum products, there is no evidence in the record that could support the conclusion that it was a general practice of Marathon, imposed upon many or all of its lessee-operators, to purchase its TBA as a condition of receiving petroleum products or of retaining leases. The only evidence about the experiences of other lessee-operators of Marathon was the testimony of five Marathon dealers who said that they had never been threatened with the loss of their leases if they did not purchase Marathon-sponsored TBA exclusively. The most that can be said for appellant's proofs is that they show that Day and Burocker were aggressive salesmen who were interested in increasing their sales of Marathon TBA.

We hold that Davis clearly failed to present sufficient evidence to permit a determination that the "total volume of sales tied by the sales policy under challenge" was not "insubstantial." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969). Likewise there was no evidence permitting a determination that Marathon's actions tended to "create a monopoly" or "substantially lessen competition." Accordingly, there was no evidence that required submission to the jury, and the district court did not err in granting the motion for judgment n. o. v. *See, e. g., Atlantic Refining Co. v. F. T. C.*, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965); *Lessig v. Tidewater Oil Co., supra.*[4]

---

4. Compare the evidence of a Clayton Act and a Sherman Act violation adduced in *Lessig v. Tidewater Oil Co., supra,* at 467–68:

Lessig offered evidence of the following circumstances in support of his allegation that Tidewater imposed upon its dealers a system of exclusive dealing and tying arrangements applicable to petroleum products, and to tires, batteries, and automotive accessories (TBA) which Tidewater sold or sponsored.[16]

16 Tidewater produced the gasoline and other petroleum products which it sold to dealers for resale. It purchased tires and batteries and resold them to dealers. It also distributed selected automotive accessories under agreements with manufacturers providing that Tidewater was to have a stipulated discount or rebate on sales to dealers.

Tidewater's service station leases were renewable annually, and were subject to cancellation at six-month intervals on thirty days' notice. Each dealer contract ended automatically upon termination of that dealer's lease. The dealer was required by his contract to purchase from Tidewater "his total requirements of gasoline, motor oils and greases, regularly manufactured and sold by" Tidewater, to an amount specified in the contract; and the amount specified in each dealer contract was the estimated full requirements of that dealer's station. When the service station lease and dealer contract

Finally, we consider whether the district court abused its discretion in refusing to permit the "eleventh hour" witnesses to testify because their names had been furnished in supplemental answers to interrogatories only three days before trial was scheduled to begin. A trial court has broad discretion in its choice of sanctions for failure to comply with discovery orders and, in appropriate circumstances, it may even dismiss the case. We hold that the trial court properly exercised its discretion here.

In January 1973, Marathon served interrogatories on appellant requesting the names of all persons acquainted with the facts of this case. On September 10, 1973, well after the time period provided in Rule 33(a) F.R.Civ.P., appellant filed an answer to these interrogatories. Then, on Friday, September 21, only three days before the trial was scheduled to begin on Monday, September 24, appellant filed supplemental answers listing five new witnesses, one of whom was his former employee.

The district court, in precluding the calling of the witnesses, observed that Davis' case had been pending for nearly two years, and expressed its concern that the primary purpose of the liberalized civil discovery rules, the prevention of surprise to one's opponent, would be undermined if these witnesses were permitted to testify.

We also observe that there was no credible support for Davis' contention that he had just "discovered" these witnesses. Reasonable diligence would have disclosed the additional witnesses far in advance of trial. One was a former employee, two were Marathon lessees, one of whom was a friend of Davis, and the other two were Marathon employees working in the Findlay area during the pendency of Davis' suit. No reason is offered and none appears why they could not have been found sooner than three days before trial.[5]

---

were executed Tidewater's representatives told the dealer that he was to purchase from Tidewater his requirements of petroleum products and of those TBA items which it sponsored or sold. Tidewater's representatives accompanied salesmen of sponsored merchandise while the latter secured orders from dealers. Tidewater's representatives inspected dealers' stations for competing merchandise, required that it be returned, and threatened nonrenewal of the offending dealer's lease. Credit card sales of nonsponsored merchandise were charged back to the dealer if the customer failed to pay. New dealers were required to purchase from outgoing dealers only inventory purchased from Tidewater.

The record disclosed the disproportionate size and economic strength of the parties.[17]

[17] Tidewater is one of the country's major oil companies. It does business in 32 states, and its assets exceed $800 million. It sold about 6.5% of the total gasoline sold in the eight western states.

There was evidence that Tidewater imposed exclusive dealing and tying arrangements against the dealers' wishes to provide Tidewater with noncompetitive access to the portion of the market which the dealers' stations represented. Dealers testified that they feared to buy competing brands of oil and sponsored TBA items even when requested by customers and even though the cost to dealers was less, and that when they purchased competing merchandise they hid it.

Evidence was offered that Tidewater entered into leases and dealer contracts, containing provisions similar to those described, with about 2,700 service station operators in eight western states. Some of the practices described admittedly were followed with respect to all Tidewater dealers, and the others appeared to be of quite general application. Thus, the jury could conclude that the restrictive provisions and practices affected a substantial portion of Tidewater's sales to its dealers of about 310 million gallons of gasoline annually (about five per cent of the gasoline sold through dealers in the area), and four to five million dollars worth of TBA.

From this evidence the jury could conclude that Tidewater sold petroleum products and sponsored TBA to its dealers upon conditions and understandings—express and tacit, oral and written—that they not deal in commodities sold by competitors of Tidewater. The only serious question is whether the jury could also conclude that these conditions and understandings might lessen competition substantially or tend to create a monopoly in a line of commerce, as required by the Clayton Act.

5. A proffer was made that the precluded witnesses would have testified to the following effect: The proffered testimony of Charles Trautwein, an employee of Davis at the College Marathon station in 1969 and 1970, would

In the short time afforded, there was virtually no way for Marathon to prepare adequately to respond to the testimony of the surprise witnesses. Unfair surprise of this sort is contrary to the policy of the federal rules, which sanction extensive discovery. If appellant had refused to answer the interrogatory in question, Marathon could have obtained an order requiring appellant to answer under Rule 37(a). Then, if appellant still refused to answer, or answered incompletely, Rule 37(b) provides that the court could issue "[a]n order . . . prohibiting . . . [the disobedient party] from introducing designated matters in evidence . . . ." Since Marathon did not know that the original answer was incomplete, it did not move for an order under Rule 37(b) to compel appellant to complete it. Even though Rule 37(b) is not directly applicable, we hold that the trial judge properly exercised discretion in regard to the surprise witnesses, and that any other decision would be contrary to the policy of Rule 37. In a similar situation, the district court for the Southern District of New York refused to permit the testimony of two witnesses. *Newsum v. Pennsylvania Ry. Co.*, 97 F.Supp. 500 (S.D.N.Y.1951).

For the foregoing reasons, the judgment of the district court will be affirmed.

## ON PETITION FOR REHEARING

### ORDER

■ Upon consideration of the petition for rehearing, the court concludes that although petitioner is correct in his contention that proffered witness Poston was not a friend of Davis as stated in our opinion,[1] this error does not require a change in our decision. The resolution of this issue turned on Davis' failure to exercise due diligence in discovering witnesses before the eve of trial. At a minimum he would have been expected to contact other Marathon lessee-dealers in the Findlay area, which in our view is not as narrowly circumscribed for this purpose as Davis would restrict it.

Accordingly, the petition is denied.

have shown only that Trautwein believed that Marathon operated a poor TBA service, that he encouraged Davis to buy TBA from other suppliers, that the Marathon sales representative was an aggressive salesman, and that Davis continued to purchase certain items of TBA from Marathon. Dennis Smith, a Marathon lessee in Ohio since 1969, was expected to testify that although he purchased the inventory already at his station when he leased it, he had not purchased any Marathon TBA for four years despite pressure from Marathon sales representatives and that he was told by one of them *a month before trial* that he "would be participating in the Marathon TBA program by the end of the year." Smith was also expected to testify that he was told that he would not receive a Marathon lease for a second station because Marathon had decided to award it to a person who participated in its TBA program and that he furtively searched the briefcase of a Marathon sales representative and discover-ed a document entitled "Goals and Objectives" that apparently suggested that unless a certain lessee purchased Marathon TBA, a new dealer would be found. Finally, Robert Poston, another Marathon lessee, was expected to testify that he purchased nearly all of his TBA requirements from Marathon because he believed it was expected of him and that a Marathon sales representative told him that if a dealer did not buy TBA from Marathon, they would find a new dealer, and that dealers who did not buy Marathon TBA would not receive gasoline, while dealers who did would receive "extras" from the company including extra gasoline.

1. The proffered testimony was that Poston was a friend of Dennis Smith, who was involved in a suit against Marathon similar to the one brought by Davis. His suit involved "Marathon Oil Company's gasoline allocation and business practices."