R & G AFFILIATES, INC., Plaintiff,

v.

KNOLL INTERNATIONAL, INC., Defendant.

No. 83 Civ. 4194.

United States District Court, S.D. New York.

June 1, 1984.

Booth, Lipton & Lipton, New York City, for plaintiff; Philip H. Kalban, Ross Rhodes, Philip Pierce, New York City, of counsel.

Parker Auspitz Neesemann & Delehanty, New York City (Barrington D. Parker, Jr., Claudia J. Flynn, New York City, of counsel) and Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex. (Richard C. Levin, Sarah L. Scharnberg, Dallas, Tex., of counsel), for defendant.

## OPINION

EDWARD WEINFELD, District Judge.

Defendant Knoll International, Inc. ("Knoll") moves for summary judgment, and plaintiff R & G Affiliates, Inc. ("R & G") cross-moves for partial summary judgment, on plaintiff's claims that defendant has imposed upon R & G a sales tying arrangement and a "preferential dealing" requirement, in violation of federal and New York antitrust laws. Defendant is a manufacturer and distributor of office furniture such as chairs, tables, desks and credenzas, and office "systems", which defendant describes as "dividers, working surfaces, cabinets and shelving ... integrated into comprehensive modular 'work stations.'"[1] Defendant's product line originally consisted primarily of office furniture, which was used with "existing office set ups and custom designed interior layouts" and stressed "distinctiveness of design."[2] In the late 1970's, because the trend in office furnishings was toward office systems, which stress functional utility and enable a user to build a complete office arrangement from components, defendant departed from its previous emphasis on furniture and introduced an office system known as "Zapf." Knoll had not "established its reputation in the area of office systems", however, so it needed the help of its dealers to enter the systems market.[3] Accordingly, Knoll told its dealers that they had to concentrate their efforts on Knoll's new ventures in office systems products, and would be expected to generate sales with a product mix in keeping with Knoll's overall sales—that is, Knoll wanted approximately 30 per cent of its dealers' sales of Knoll products to be sales of systems rather than furniture.[4]

Plaintiff is a dealer in office furniture and office systems, and has been an authorized dealer in Knoll products for about

1. Defendant's Statement Pursuant to Rule 3(g) ¶ 8 (hereinafter cited as *Defendant's 3(g)*); Affidavit of Mark Grottano in Support of Plaintiff's Motion for a Preliminary Injunction ¶ 3 (hereinafter cited as *Grottano Affidavit*).

2. *Grottano Affidavit,* ¶ 3 and ¶ 4.

3. Defendant's Memorandum in Support of its Motion for Summary Judgment 6; *see also* Defendant's Statement Pursuant to Rule 3(g) in Opposition to Plaintiff's Cross Motion for a Partial Summary Judgment § B ¶¶ 10, 11 (hereinafter cited as *Defendant's 3(g) in Opposition*).

4. *Defendant's 3(g) in Opposition* § B ¶ 12; Affidavit of Jana Goldin in Support of Defendant's

eighteen years. Most of its sales are of "contract furniture"—furnishings sold to the non-residential market such as offices and institutions, for a particular renovation or building project.[5] Usually, architects or designers are involved in selecting which product will be purchased for a particular project, and may specify a particular manufacturer's product when soliciting bids. Approximately 60 per cent of plaintiff's sales are of systems.

In 1981, plaintiff's sales of Zapf began to fall, and defendant expressed increasing concern about plaintiff's product mix. In response, plaintiff submitted to defendant a written plan to stimulate plaintiff's sales of defendant's systems, establishing a goal of $1 million in total sales, with the "direction of that business clearly ... towards the Zapf systems business."[6] While plaintiff's total sales of Knoll products were $1 million or more in 1982, its sales of Zapf continued to fall that year. After some discussion of the problems between them, defendant informed plaintiff in December 1982 that plaintiff's dealership was being terminated because, at least in part, plaintiff's sales had not been in keeping with defendant's desired product mix. The par-

ties agreed to stay the termination while these motions were pending.

## I. The Tying Claim

 Plaintiff charges that defendant has imposed a tying arrangement upon its dealers, in violation of Section 1 of the Sherman Act[7] and Section 3 of the Clayton Act.[8] A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."[9] The "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying market to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated."[10]

To sustain a claim of tying, plaintiff must first show that it entered into a contract or combination with defendant—that it agreed to the alleged tying arrangement.[11] Then, plaintiff must prove the five essential elements of a tying arrangement:

Motion for Summary Judgment ¶ 9 (hereinafter cited as *Goldin Affidavit*); Plaintiff's Statement Pursuant to Rule 3(g) ¶ 12 (hereinafter cited as *Plaintiff's 3(g)*).

5. *Defendant's 3(g)* ¶ 16; Deposition of James Gangitano 24 (hereinafter cited as *Gangitano Deposition*); Deposition of Mark Grottano 17 (hereinafter cited as *Grottano Deposition*).

6. *Defendant's 3(g)* ¶ 42; Grottano Deposition 57; Supplemental Affidavit of Jana Goldin in Support of Defendant's Motion for Summary Judgment ¶ 2.

7. Section 1 of the Sherman Act, 15 U.S.C. § 1 (1983), reads in pertinent part:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

8. Section 3 of the Clayton Act, 15 U.S.C. § 14 (1973), reads:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether

patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

9. *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

10. *Jefferson Parish Hospital District No. 2 v. Hyde,* —— U.S. ——, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

11. Section 1 of the Sherman Act, 15 U.S.C. § 1, expressly forbids only contracts, combinations or conspiracies in restraint of trade. Section 3

1) a tying and a tied product; 2) evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product; 3) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; 4) anticompetitive effects in the tied market; and 5) involvement of a "not insubstantial" amount of interstate commerce in the tied product market.[12]

The parties agree that the defendant "requires its dealers to sell a certain mix of Knoll products" in order to retain their dealerships.[13] According to the defendant, it is entitled to summary judgment on the tying claim because the undisputed facts indicate that plaintiff never consented to the requirement. Further, defendant argues that even if plaintiff had agreed to the requirement, the undisputed facts show that plaintiff never purchased systems unwillingly, as is necessary to satisfy the coercion element, and that the requirement had no anticompetitive effect on the market for office systems, as is necessary for the fourth element of tying. Plaintiff, on the other hand, asserts that it did acquiesce in the product mix requirement, even though its Zapf purchases did not amount to 30 per cent of its total purchases of Knoll products, and that the undisputed facts establish the acting in concert requirement and each of the five elements of tying, and entitle plaintiff to summary judgment.

## A. The Concerted Action Requirement

Defendant first argues that plaintiff has failed to show the concerted action neces-

sary to constitute a violation of 15 U.S.C. §§ 1 and 14. According to defendant, its termination of plaintiff's dealership was a unilateral refusal to deal protected by the doctrine of *United States v. Colgate & Co.*,[14] rather than a concerted action or combination. In *Colgate*, the Supreme Court held:

> In the absence of any purpose to create or maintain a monopoly, the [Sherman] [A]ct does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.[15]

■ The *Colgate* doctrine has been narrowed considerably by recent decisions,[16] and the concerted action required by the Sherman and Clayton Acts may now be shown by "proof of 1) an express or implied agreement, or 2) the securing of actual adherence to [the policy at issue] by means beyond mere refusal to deal."[17] Threats of termination are "means beyond mere refusal to deal", and if they secure actual adherence to the policy, "trespass beyond the boundaries of *Colgate*."[18]

■ Defendant acknowledges the current interpretation of *Colgate*, but argues that even if it did threaten plaintiff with termination, there was no concerted action, because the undisputed facts show that plaintiff never yielded to the alleged pressure to enter into a tying arrangement. Defendant points to plaintiff's admissions

of the Clayton Act, 15 U.S.C. § 14, forbids only a "sale or contract for sale ... on the condition, agreement, or understanding [of exclusive dealing] ...." Thus, both sections require concerted rather than unilateral activity.

**12.** *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56–57 (2d Cir.1980).

**13.** Defendant's Response to Plaintiff's Reply Memorandum in Support of Plaintiff's Cross-Motion for Partial Summary Judgment 3; *Compare Defendant's 3(g)* ¶ 12 with Plaintiff's 3(g) § 1, ¶ 12. *See also Goldin* Affidavit ¶ 9.

**14.** 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

**15.** *Id.* at 307, 39 S.Ct. at 468.

**16.** *See, e.g., Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *Fed. Trade Comm'n v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *see also Russell Stover Candies, Inc. v. Fed. Trade Comm'n*, 718 F.2d 256 (8th Cir.1983).

**17.** *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 52 (2d Cir.1980).

**18.** *Id.* at 53.

that its sales of the allegedly tied product fell, and its sales of competitors' products increased, in recent years,[19] as proof that any threats or pressure did not in fact secure adherence to the policy. Plaintiff has submitted evidence, however, that its sales people pushed Zapf over competitors' systems, and sold Zapf when they might otherwise have sold a competitive product, in acquiescence to the alleged policy.[20] That evidence raises an issue of fact about whether plaintiff adhered to the alleged tie-in, and whether plaintiff and defendant entered into a "contract, combination ... or conspiracy." [21]

### B. Coercion

■ In order to establish the element of tying the parties dispute most—coercion—plaintiff must show that it is the "unwilling purchaser of an unwanted product." [22] Plaintiff admits that it was willing, indeed that it desired, to sell office systems as well as office furniture, and that it never sought to be a dealer in Knoll furniture alone.[23] Plaintiff contends, however, that it was unwilling to sell the quantities of office systems that defendant required, i.e., it was unwilling to have office systems account for 30 per cent of its total sales of defendant's products.

■ Plaintiff's willingness to purchase some number of systems does not preclude a finding of coercion as to additional and unwanted quantities. The free market mandated by the Sherman and Clayton Acts "is distorted whenever a buyer is induced to buy any amount of the tied goods because of a tie-in" rather than for reasons that motivate a reasonable buyer in a competitive market, such as price or quality.[24] A tie-in whereby a seller offers 70 units of product A only if the buyer also buys 30 units of product B obviously is not saved from illegality merely because the buyer would willingly take one unit of product B. Such a tie-in "force[s] a purchaser to do something that he would not do in a competitive market"—buy the additional 29 units—and thus may be unlawful.[25]

Nor is a finding of coercion precluded by defendant's claim that its conduct is "aggressive salesmanship" protected by Unijax, Inc. v. Champion Int'l, Inc.[26] In Uni-

---

**19.** Compare Defendant's 3(g) ¶¶ 27, 29 with Plaintiff's 3(g) § 11, ¶ 6. Pursuant to Local Rule of Procedure 3(g), Southern District of New York, all material facts set forth in a Rule 3(g) statement will be deemed admitted unless controverted by the statement served by the opposing party. See also Grottano Deposition 96; Grottano Affidavit ¶ 7.

**20.** Affidavit of James Gangitano in Opposition to Defendant's Motion for Summary Judgment ¶¶ 5, 6, 7; Affidavit of Richard Bernstein in Opposition to Defendant's Motion for Summary Judgment ¶¶ 5, 6 (hereinafter cited as Bernstein Affidavit); Grottano Affidavit ¶¶ 9, 16. See Yentsch v. Texaco, 630 F.2d 46, 54–55 (2d Cir. 1980) (Fact that dealer once lowered his prices for a short time in response to threats that his dealership would be terminated supported a finding of actual adherence to the challenged policy, and evidence that dealer refused to adhere to the policy at other times did not "insulate [the defendant's] behavior.")

**21.** 15 U.S.C. § 1. Plaintiff also raises an issue of fact regarding whether other Knoll dealers in the New York, New Jersey, and Connecticut area have yielded to the alleged tie-in. The combination required by 15 U.S.C. § 1 may be proved not only by evidence that plaintiff succumbed to the alleged tie-in, but also by evidence that the alleged tie-in was 1) firmly enforced, 2) applied to all Knoll dealers, and 3) acquiesced in by most of them. Albrecht v. Herald Co., 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968); Yentsch v. Texaco, 630 F.2d 46, 52 (2d Cir.1980).

**22.** Capital Temporaries, Inc. of Hartford v. Olsten Corp., 506 F.2d 658, 662 (2d Cir.1974). See also Shop & Save Food Markets, Inc. v. Pneumo Corp., 683 F.2d 27, 30 (2d Cir.), cert. denied, 459 U.S. 1038, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982); Hill v. A–T–O, Inc., 535 F.2d 1349, 1355 (2d Cir.1976).

**23.** Compare Defendant's 3(g) ¶ ¶ 59, 60 with Plaintiff's 3(g) § II ¶ 6.

**24.** Tire Sales Corp. v. Cities Service Oil Co., 410 F.Supp. 1222, 1228 n. 8 (N.D.Ill.1976), rev'd on other grounds, 637 F.2d 467 (7th Cir.1980), cert. denied, 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981); see also Northern Pac. Ry. Co. v. United States 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

**25.** Jefferson Parish Hospital District No. 2 v. Hyde, —— U.S. ——, 104 S.Ct. 1551, 1559, 80 L.Ed.2d 2 (1984).

**26.** 683 F.2d 678 (2d Cir.1982).

*jax,* a paper distributor charged that Champion, a paper manufacturer, had conditioned the sale of a particular paper, Kromekote, on the purchase of other papers. In upholding the trial court's judgment n.o.v. for the manufacturer, our Court of Appeals stated:

> Champion's policy was to persuade all its retailers to carry its complete line of fine paper products. Naturally, Champion also vigorously encouraged Unijax to purchase all grades of Champion paper, including the Kromekote grade.... Champion, however, did not place any condition on Unijax's purchase of the Kromekote grade. Unsuccessful in its efforts to exhort Unijax to meet agreed upon sales goals, Champion ultimately stopped supplying several Unijax branches.... This conduct, which Unijax asserts was unlawful coercive behavior, is nothing more than aggressive salesmanship and is therefore insufficient evidence to support a finding of the actual exercise of economic muscle, an indispensable element for proving a tying violation.[27]

In finding that Champion had practiced mere aggressive salesmanship, rather than coercion, the Court noted that Unijax "failed to introduce any evidence that Champion had ever required, or even threatened to require, the company to purchase various grades of Champion's other fine paper or face a cut-off of the Kromekote grade. Moreover, Unijax did not present any evidence that it sought to purchase only the Kromekote grade and the Champion would not permit it to do so."[28] Indeed, the Court found that Champion had been dissatisfied with Unijax's sales of all grades of paper (including the alleged tying product—the Kromekote grade), which had declined approximately 80 per cent in four years.[29]

The *Unijax* Court relied on two decisions from other circuits in reaching its decision: *Bob Maxfield, Inc. v. American Motors Corp.,*[30] and *Davis v. Marathon Oil Co.*[31] In *Maxfield,* an automobile retailer charged that American Motors Corp. (AMC) was tying the sale of unpopular big cars to the sale of fast selling Gremlins and Hornets. The Fifth Circuit upheld a directed verdict against plaintiff, finding that while the AMC representatives "tried vigorously to sell big cars to Maxfield," informing him of the number of big cars they wanted him to buy and persuading and encouraging him to buy that number, there was no evidence that AMC ever *required* Maxfield to take large cars or face a cut-off of small cars.[32] The Court noted that Maxfield admitted that "no one ever made any actual threats to that effect" and that Maxfield "did not show one instance of any particular occurrence or statement showing an enforced requirement that it buy big cars."[33]

In *Davis,* plaintiff charged that his service station lease had been cancelled because the lease (and the concomitant gasoline sales) were illegally tied to the purchase of sufficient quantities of tires, batteries and accessories (TBA). The Sixth Circuit affirmed a grant of judgment n.o.v., finding that there was insufficient evidence to permit a finding that the defendant had conditioned the continuation of plaintiff's lease upon the purchase of TBA. The Court noted that the plaintiff had introduced evidence that on one occasion a salesman intimated that the plaintiff's low volume of TBA sales could result in cancellation of the lease, but "no express threats to cancel the lease were made by the salesmen and there was no communication from any other Marathon employee or officer."[34]

27. *Id.* at 685–86 (footnotes and citations omitted).

28. *Id.* at 686.

29. *Id.* at 681 n. 9.

30. 637 F.2d 1033 (5th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981).

31. 528 F.2d 395 (6th Cir.1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976).

32. *Box Maxfield,* 637 F.2d at 1037.

33. *Id.*

34. *Davis,* 528 F.2d at 402; *see also Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 709 (7th Cir.1977).

In contrast to the plaintiffs in *Unijax, Bob Maxfield,* and *Davis,* plaintiff here has submitted evidence that defendant *required* plaintiff to purchase a specified quantity of systems or face a cut-off of furniture through cancellation of the dealership. Plaintiff's officer testified at his deposition that defendant's vice president and other officers made it "very clear" that plaintiff "had to sell systems to be part of Knoll,"[35] and defendant admits that plaintiff's failure to meet the product mix "goal" was a cause of plaintiff's termination.[36] The evidence presented raises a question of fact whether defendant went beyond "strong persuasion, encouragement, or cajolery to the point of obnoxiousness"[37] and instead coerced its dealers into buying the Zapf systems.

Indeed, plaintiff's evidence is similar to that found sufficient to establish coercion in *Osborn v. Sinclair Refining Company.*[38] There, the Fourth Circuit held that where service station dealers were warned by the refiner that their sales of tires, batteries and accessories (TBA) were insufficient, the dealers understood that unless they purchased more TBA their leases would be terminated, and the dealers' volume of TBA purchases was specifically considered in the decision to renew or terminate the dealers' leases, the refiner's efforts to induce its dealers to carry a substantial quantity of TBA went beyond mere persuasion and constituted an actual coercive condition for the continued sale of gasoline under their leases.[39]

R & G has presented sufficient evidence to raise a genuine issue of material fact about whether defendant's efforts went beyond "aggressive salesmanship" and reached the level of coercion. Even if defendant's efforts were coercive in nature,

however, plaintiff must show that those efforts were successful, and actually "forced the buyer to accept the tied product."[40] As noted previously, the issue of whether plaintiff adhered to the alleged tie-in demands trial. Thus, both parties have raised genuine issues of fact on this element of the tying claim.

## C. Anticompetitive Effect in the Market

Defendant next argues that as a matter of law, plaintiff could not sustain the fourth element of tying, the requirement that the alleged tie-in create an anticompetitive effect in the marketplace, because plaintiff admits that its sales of competitors' office systems increased while the alleged policy was in effect. As further evidence that the alleged tie-in had no anticompetitive effect, defendant points to the fact that in 1982, plaintiff's sales of defendant's systems accounted for less than 1 per cent of plaintiff's total sales of systems. Plaintiff contends, however, that but for the alleged tie-in, its sales of competitors' products would have been even greater, because the alleged tie-in caused plaintiff to sell Zapf when it otherwise might have sold other systems.

When tying arrangements "are successfully exacted, competition on the merits with respect to the tied product is inevitably curbed. Indeed 'tying' arrangements serve hardly any purpose beyond the suppression of competition.'"[41] "By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market.... [A]ny intrinsic superiority of the 'tied' product would con-

---

**35.** *Grottano Deposition* 133; *see also* Grottano *Affidavit* ¶¶ 8, 16; *Bernstein Affidavit* ¶ 3.

**36.** *Defendant's 3(g) in Opposition* § B ¶ 15.

**37.** *Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1037 (5th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981).

**38.** 286 F.2d 832 (4th Cir.1960), *cert. denied,* 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961).

**39.** *Id.* at 839.

**40.** *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 57 (2d Cir.1980); *see also Petroleum for Contractors, Inc. v. Mobil Oil Corp.,* 493 F.Supp. 320, 325 (S.D.N.Y.1980).

**41.** *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

vince freely choosing buyers to select it over others anyway." [42] Plaintiff has raised a question of fact regarding whether it complied with the alleged tying policy to the extent of buying Zapf for sale to its customers when in the exercise of independent judgment about Zapf's merits, it would have preferred competitors' products. Resolution of the issue of the anticompetitive effect of the alleged tie-in therefore must await trial.

### D. Separate Tied and Tying Products

■ Plaintiff's cross-motion argues that as a matter of law defendant's office furniture is a separate product from its office systems.[43] Defendant asserts that the furniture and systems are merely "component parts of the overall ... [dealership] package," rather than separate products.[44] The fact that defendant manufactures both products does not make them a "package", however. Similarly, defendant's reliance on *Principe v. McDonald's Corp.*[45] and other franchise cases is inapposite, because defendant's dealership does not offer dealers "a complete method of doing business" as did the franchise in *Principe*.[46]

Nevertheless, plaintiff has not shown that the undisputed facts establish that systems and furniture are separate products. The "answer to the question whether one or two products are involved turns ... on the character of the demand for the two items." [47] The plaintiff's Rule 3(g) statement contains no contentions regarding the nature of the demand for office systems

and office furniture, and does not allege that they are "distinguishable in the eyes of buyers." [48] Nor does it allege that other manufacturers sold furniture and systems separately.[49] Without agreement on those factual issues, this element of tying cannot be decided as a matter of law.

### E. Economic Power

Plaintiff asserts that as a matter of law, defendant has sufficient economic power with respect to the alleged tying product, office furniture, to restrain appreciably free competition in the market for office systems, the allegedly tied product. Under this element of tying, the question is "whether the seller has some advantage not shared by his competitors in the market for the tying product." [50] According to plaintiff, the requisite economic power can be presumed here because defendant admits that some of its furniture is patented. Plaintiff also contends that the necessary market power can be inferred from defendant's admission that in soliciting bids for their projects, architects and end users frequently specify that defendant's office furniture is to be used.

■ It is true that "the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes" and that the "requisite economic power is presumed when the tying product is patented or copy-

---

**42.** *Jefferson Parish Hospital District No. 2 v. Hyde,* — U.S. —, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984) (*quoting Times Picayune Pub. Co. v. United States,* 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953) (footnote omitted)).

**43.** While defendant assumed the existence of separate tied and tying products, the existence of sufficient economic power in the tying market, and involvement of a "not insubstantial" amount of interstate commerce, for the purposes of its motion for summary judgment, it contested those elements in response to plaintiff's cross-motion.

**44.** *Principe v. McDonald's Corp.,* 631 F.2d 303, 308 (4th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981).

**45.** *Id.*

**46.** *Id.* at 309; *see also United States v. Mercedes-Benz of North America,* 517 F.Supp. 1369, 1379–81 (N.D.Cal.1981).

**47.** *Jefferson Parish Hospital District No. 2 v. Hyde,* — U.S. —, 104 S.Ct. 1551, 1562, 80 L.Ed.2d 2 (1984).

**48.** *Id.*

**49.** *See, e.g., United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 559 (E.D.Penn.1960), *aff'd per curiam,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

**50.** *United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 620, 97 S.Ct. 861, 867, 51 L.Ed.2d 80 (1977).

righted."[51] Those rules "reflect a hostility to use of the statutorily granted patent monopoly to extend that patentee's economic control to unpatented products," and are based on "the theory that the existence of a valid patent on the tying product, without more, establishes a distinctiveness sufficient to conclude that any tying arrangement involving the patented product would have anticompetitive consequences."[52] Here, however, the alleged tying product is not one unique patented product, but a dealership in an entire line of furniture, not all of which is patented. It is not evident what role the patented furniture, as distinguished from the entire line, plays in the alleged tie-in. Further, it is not clear that the furniture that is patented actually is sufficiently distinctive to confer the required market power. "A patent holder has no market power in any relevant sense if there are close substitutes for the patented product."[53]

■ In addition, as the Supreme Court recently made clear in *Jefferson Parish Hospital v. Hyde*,[54] the fact that purchasers, even 30 per cent of the relevant purchasers, prefer a particular product does not "establish the kind of dominant market position that obviates the need for further inquiry into the actual competitive conditions."[55] While defendant here acknowledges that the reputation of its office furniture is such that some customers ask for it by name, that fact alone does not establish that the defendant has the "special ability"

to force a tying arrangement upon the purchasers.[56] Moreover, the facts presented on this motion as to the level of plaintiff's sales of defendant's products as a percentage of plaintiff's total sales leave an open question about how strong purchasers' preference for defendant's furniture is. The issue of defendant's economic power therefore cannot be decided as a matter of law.

### F. Amount of Commerce Affected

Finally, plaintiff claims that the undisputed facts establish the fifth element of tying—the requirement that the amount of interstate commerce involved in the tied product market is "not insubstantial."[57] Plaintiff maintains that its sales of defendant's office systems in 1982 were $100,000; defendant asserts that the sales were less than that amount. Further, even assuming the sales were approximately $100,000, it remains to be proved how many of those sales were involved in the alleged tying arrangement and how many were willing purchases that plaintiff would have made even absent the alleged tie.[58]

In sum, material issues of fact remain on each of the elements plaintiff must prove to establish a tying arrangement in violation of the Sherman and Clayton Acts. The cross-motions for summary judgment on count one of the complaint therefore are denied.

---

**51.** *United States v. Loew's Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962).

**52.** *Id.* at 46, 83 S.Ct. at 102.

**53.** *Jefferson Parish Hospital District No. 2 v. Hyde,* — U.S. ——, 104 S.Ct. 1551, 1572 n. 7, 80 L.Ed.2d 2 (1984). (O'Connor, J., concurring).

**54.** *Id.*

**55.** *Id.* at 1566.

**56.** *Id.* at 1559.

**57.** *Fortner Enterprises v. United States Steel Corp.,* 394 U.S. 495, 503, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969). In *Fortner,* the Supreme Court found that $190,000 was sufficiently substantial to meet the test. The Court found payments ranging from $60,800 to over $2,500,000 sufficiently substantial in *United States v. Loew's Inc.,* 371 U.S. 38, 49, 83 S.Ct. 97, 104, 9 L.Ed.2d 11 (1962); *see also Yentsch v. Texaco,* 630 F.2d 46, 58 (2d Cir.1980). (Court not convinced that $15,000 would meet the test, but $60,000 certainly would); *AAMCO Automatic Transmissions, Inc. v. Tayloe,* 407 F.Supp. 430, 436 (E.D.Pa.1976) ($50,000 not insubstantial); *Detroit City Dairy Inc. v. Kowalski Sausage Co.,* 393 F.Supp. 453, 472 (E.D.Mich.1975) ($86,376 not insubstantial); *Haas Trucking Corp. v. New York Fruit Auction Corp.,* 364 F.Supp. 868 (S.D. N.Y.1973) ($31,000, $25,000, and $7,800 do not meet the substantially test).

**58.** *Cf. Petroleum for Contractors Inc. v. Mobil Oil Corp.,* 493 F.Supp. 320, 325 (S.D.N.Y.1980) (plaintiffs failed to specify which of the purchases resulted from the alleged tie-in).

## II. Exclusive or "Preferential" Dealing

Plaintiff's second count charges that defendant coerced plaintiff into agreeing to "reduce significantly its purchases of office systems of other manufacturers" in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.[59] Plaintiff admits that it never agreed to deal exclusively in the defendant's products, but asserts that defendant imposed a "preferential dealing" arrangement upon its dealers.

Summary judgment is granted in favor of defendant on plaintiff's second count. This claim under Section 1 of the Sherman Act fails because that section requires proof that plaintiff agreed to the alleged preferential dealing arrangement. The deposition testimony of plaintiff's president indicates that plaintiff explicitly refused to agree to defendant's alleged demand that plaintiff "significantly de-emphasize" competitors' products and that plaintiff never had an agreement or understanding with the defendant that it would handle defendant's line alone and drop other lines.[60]

Similarly, Section 3 of the Clayton Act requires proof of concerted action that plaintiff could not sustain in view of its admission that it did not agree to defendant's alleged demands. In addition, Section 3 forbids only the sale or contract for sale of goods "on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise ... of a competitor." Plaintiff's attempt to convert the prohibition against exclusive dealing contracts into one against "preferential" contracts flies in the fact of the statute.

Plaintiff's claim under 15 U.S.C. § 2 also fails as a matter of law. Plaintiff has not pressed that claim in its papers, and has admitted that the relevant market is highly competitive, even though "monopoly power" or a "dangerous probability of success in monopolizing a given market" is necessary to establish a claim of monopolization or attempted monopolization.[61]

Summary judgment in favor of defendant therefore is granted on count two of the complaint.

## III. New York's Donnelly Act

Plaintiff and defendant both seek summary judgment on plaintiff's claim that defendant's termination of the dealership constitutes a violation of New York Gen. Bus.L. § 340, the Donnelly Act.[62] Both admit, however, that the Donnelly Act is patterned after the federal Sherman Act.[63] Thus, for the reasons set forth in the dis-

**59.** 15 U.S.C. § 2 (1983) states, in pertinent part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ....

**60.** *Gangitano Deposition* 121.

**61.** *See United States v. Grinnel Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Times Picayune Pub. Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.,* 614 F.2d 832 (2d Cir.1980); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

**62.** New York Gen.Bus.L. § 340 (1968) states, in pertinent part:

1. Every contract, agreement, arrangement or combination whereby

A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby

Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained, or whereby

For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void.

**63.** *See Optivision, Inc. v. Syracuse Shopping Center Associates,* 472 F.Supp. 665, 680 (N.D.N.Y. 1979); *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 381 N.Y.S.2d 426, 344 N.E.2d 357 (1976).

cussion of the tying claim above, summary judgment is not warranted.

SO ORDERED.