POSA, INC., J. Posa, Inc., and
Riverside Warehouse, Inc.,
Plaintiffs,

v.

MILLER BREWING
COMPANY, Defendant.

No. CV 81–1245.

United States District Court,
E.D. New York.

March 31, 1986.

Gerald E. Ross, New York City, for plaintiffs.

Merrick B. Garland, Jocelyn F. Samuels, Arnold E. Porter, Attorneys for Defendants Washington, D.C. and Conboy, Hewitt, O'Brien & Boardman, New York City, for defendant.

MISHLER, District Judge.

Plaintiffs in this case are two trucking companies (Posa, Inc. and J. Posa, Inc.) and a warehousing company (Riverside Warehouse, Inc.) all wholly owned by members of the family of F. Joseph Posa ("Posa"). Defendant, Miller Brewing Company ("Miller"), a Wisconsin corporation with its principal place of business in Wisconsin, is engaged in business as a brewer of various brands of beer. From 1977 to 1980 the Posa trucking companies hauled beer from the Miller brewery located in Fulton, New York, to distributors of Miller beer in New York and neighboring states. During this same period the Posa warehousing company stored beer and related dunnage (wooden pallets, empty kegs and used bottles) for Miller and its distributors in a number of warehouses in the Fulton area. In late 1979 Miller stopped doing business with the warehousing company and in April 1980 it barred the trucking companies from its property.

On April 24, 1981, plaintiffs filed their initial complaint, which enumerated 13 causes of action arising, for the most part, out of the circumstances surrounding this termination of relations. The claims can be broken down into three categories: (1) Counts I–V allege a variety of common law torts including libel and interference with business relations; (2) Counts VI–X allege several breaches of contract; and (3) Counts XI–XIII state civil claims for anti-trust violations. Presently before us are defendant's motion for summary judgment on the tort and anti-trust claims, plaintiffs' cross motion to amend the complaint, for summary judgment on two of the contract claims, for partial summary judgment on the issue of liability on the tort and anti-trust claims, and for a jury trial on the issues not disposed of by these motions.

## FACTS

In 1976 Miller opened a brewery in the town of Fulton, New York. Miller sells its beer to wholesale dealers, known as distributors, who in turn sell to retail stores, bars and restaurants. Although Miller owns a few of its distributors, most are independent businesses owned by third parties. Beer is shipped from the brewery to the distributors' warehouses by rail or truck. Of the beer that is shipped by truck some is hauled by the distributors' own trucks and some by common carriers. The common carriers are regulated, with respect to interstate hauling, by the Interstate Commerce Commission ("ICC") and, with respect to intrastate hauling, by the New York State Department of Transportation ("DOT"). Whether inter or intra state, a common carrier trucking company must have a hauling license or "authority" issued by the appropriate regulatory agency,

which covers the types of products it can haul and the geographic limits to its hauling authority.

Posa, Inc. first applied to the DOT for authority to service the Fulton brewery shortly after it began production in 1976. Miller supported the application and in 1977 Posa, Inc. received permanent authority from the DOT. As of January 1977 there were, including Posa, 17 trucking companies with authority from the ICC to haul beer interstate from the Fulton brewery of which 14 also had DOT authority for intrastate shipping. In 1977–78 the Posa family began operating Riverside Warehouse, Inc. The warehouse operation eventually consisted of three warehouses in the area which were made available to Miller and its distributors for the storage of beer, dunnage and other supplies.

Sometime prior to September 13, 1978, Miller determined that Posa had been making some hauls for which it had no DOT authorization. Specifically, Miller found that Posa had transported loads of dunnage, empties and other materials from the brewery to various warehouses in the Fulton area in violation of its DOT license, which only granted Posa the authority to transport such material inbound into the brewery. (Pl.App.Doc. No. 6568). Miller then advised its personnel that they should stop using Posa for shipments other than beer from the brewery as Posa had been operating illegally with respect to shipments of materials (Def.Mem.Ex.C).

Early in 1979 Miller received a complaint from one of Posa's competitors in the shipping business which alleged that a number of improper activities were going on at the Fulton plant. The accusations for the most part were leveled against Richard Zarski, Miller's traffic manager at the brewery. Posa was accused of improperly inducing Zarski to give it preferential treatment. At about the same time Miller received complaints about Posa from several of its distributors.[1]

In response to these complaints Miller commenced an investigation. On May 25, 1979 there was a meeting between Zarski and several Miller executives. Miller had apparently concluded that there was some substance to the accusations that Zarski had accepted bribes and had knowingly allowed Posa to make illegal hauls and, over Zarski's protestations of innocence, summarily fired him.

Some time prior to this meeting, in a letter dated May 11, 1979, Miller was asked to cooperate with the DOT in an investigation the Department was conducting into possibly unauthorized transportation of beer by a trucking company from warehouses located in the Fulton area. By letter dated June 4, 1979, the DOT informed the Posas that its investigation indicated that they had been "transporting commodities for the Miller Brewing Company ... without the necessary operating authority" and that such transportation was in violation of Article 7 of the New York Transportation Law. (Def.Mem.Ex.F). A copy of this letter was also sent to Miller.

On October 26, 1979 the DOT instituted an administrative proceeding in order to investigate alleged irregularities in the Posas' operations. On January 3, 1980 the DOT brought a civil action in New York State Supreme Court against the Posas claiming numerous violations of the New York Transportation Law by unauthorized shipments from the Fulton brewery and from the Riverside warehouses. The DOT sought to recover a total of over $700,000 in fines. On February 21, 1980 the court issued an order approving a settlement and discontinuance of this lawsuit pursuant to which the Posas were to pay $12,000 to the DOT and to reimburse certain shippers for 504 overcharges made during 1979. (Def. Mem.Ex.I).

On April 25, 1980 Miller sent a bulletin to its Fulton distributors informing them that the Posas were to be barred from Miller property. The bulletin attached a list of

---

1. These complaints alleged certain improprieties such as kickbacks surrounding Posa's "spotting" services at the brewery. "Spotting" involves the shifting and parking of trailers to and from the loading dock at the brewery. Posa performed this service for the distributors for a fee.

trucking companies that Miller found had "demonstrated their reliability and their willingness to comply with reasonable rules and regulations." The bulletin then went on to inform the distributors that the Posas were not on the list of approved carriers and therefore would not be permitted on Miller property after May 4, 1980.

Since the beer that was to be shipped by truck was picked up at loading facilities on Miller's premises, the ban effectively ended Posa's ability to haul beer from the Fulton brewery for the distributors. Apparently much of Posa's business involved servicing the Miller distributors thus the shut-out had a great financial impact. One distributor responded to the bulletin with a letter to Miller inquiring why the Posas, who did 90 percent of the distributors' shipping and had given excellent service, were no longer permitted on Miller property. (Def.Mem. Ex.K). Miller's answer basically repeated the wording of the original bulletin.

Meanwhile, on April 29, 1980, the DOT took action on a license application by the Posas which sought, inter alia, to extend the geographic limits to the original grant of authority. In his decision on the application the Administrative Law Judge ("ALJ") noted that the DOT withdrew the administrative proceeding that had been commenced on October 26, 1979. The ALJ's decision was to extend the scope of authority to a limited degree.[2] Plaintiffs assert that this decision "cleared" Posa and that under the newly expanded authority the hauls that previously were considered by Miller to have been illegal, would now be permissible.

In 1981 Posa, Inc. sued a Miller distributor in New York State Supreme Court to recover charges for shipments of beer from the Fulton brewery to the Riverside warehouse and from the warehouse to the distributor's place of business. The state court held that Posa was not entitled to recover for the shipments from the ware-

house to the distributor because those shipments were outside the authority granted in Posa's license from the DOT.

## DISCUSSION

### 1. The Motion to Amend the Complaint

██ The amended complaint makes a number of additions and deletions to the factual allegations in the original complaint. The additions appear to be for purposes of correcting insufficiently stated claims, the deletions have the effect of dropping certain clearly unprovable claims or theories from the case. Specifically, the amendments would make the following changes in the original complaint: (1) Count II, which stated a claim of tortious interference in contractual relations is withdrawn; (2) Count III is slightly modified by adding to the claim of interference with pending orders to ship Miller products from the Fulton brewery, the allegation that other pending orders, these from Eden, North Carolina, were likewise interfered with; (3) Counts XI and XII, which alleged a concerted refusal to deal and/or group boycott in violation of § 1 of the Sherman Act, are deleted; they are replaced with other anti-trust claims that are based on a theory of an illegal tying arrangement. Defendant has no objection to the deletions but argues that the tying claims and revised interference with contract claims should not be allowed.

Rule 15(a), Fed.R.Civ.P. provides that leave to amend "shall be freely granted where justice so requires." If the plaintiff has at least colorable grounds for relief, leave to amend shall be granted unless the plaintiff is guilty of undue delay, bad faith, or if defendant would be unduly prejudiced. *S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 42 (2d Cir.1979). We are not persuaded by defendant's argument that it would be unduly prejudiced by

---

**2.** In the original license Posa, Inc. was authorized to haul beer and related advertising from the Town of Volney (the location of the Fulton brewery) to all points in the State of New York, and to haul returned, refused and rejected com-

modities in the opposite direction. The extension enlarged the permissible point of origin/destination from the Town of Volney to the Counties of Oswego and Onondaga. (Pl.App.Ex. 19).

the proposed amendments. Defendant claims it is prejudiced because it will have to expend additional time and money in refuting the revised claims and in redeposing plaintiffs' principals. However these arguments are deprived of much of their force in the light of the fact that defendant has already made a substantial response to the amended complaint in its Reply Memorandum in Opposition. There is no indication that plaintiffs have engaged in bad faith or dilatory tactics, rather it appears that facts uncovered during discovery have convinced plaintiffs that the underlying transactions and occurrences support somewhat differing theories of liability than those articulated in the initial complaint. Plaintiffs' request to amend is therefore granted.

## 2. *The Request for a Jury Trial*

A party seeking a jury trial of any issue so triable as of right is required to serve a "demand therefor ... not later than 10 days after service of the last pleading directed to such issue." Fed.R.Civ.P. 38(b). The failure to make such demand constitutes a waiver. Fed.R.Civ.P. 38(d). As the instant plaintiffs did not demand a jury trial in their complaint, within 10 days of service of defendant's answer, or indeed at any time during the next four years, they have thus waived their right. While Fed.R. Civ.P. 39(b) does allow parties, by motion, to make an untimely demand for a jury trial, the courts have only limited discretion to grant such a request. *Noonan v. Cunard Steamship Co.*, 375 F.2d 69, 70 (2d Cir.1967). It is the rule in this circuit that "[u]ntimely requests for jury trial must be denied unless some cause beyond mere inadvertence is shown." *Galella v. Onassis*, 487 F.2d 986, 996 (2d Cir.1973). Amending a complaint to assert new issues revives a party's right to a jury trial, however, the revived right only applies to genuinely new issues not relating to the same general area of dispute raised in the original complaint. *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1310 (2d Cir.1973).

In this case plaintiffs have given no reason to justify their failure to demand a jury trial within the time frame provided by Rule 38(b). Nor has the right to request a jury trial been revived by the amended complaint as no new issues have been raised. Although the amended complaint changes the theoretical basis for the anti-trust claims from a concerted refusal to deal to an illegal tying arrangement, the underlying facts that must be proven, as well as the basic legal issue of whether defendant has acted in such a way as to cause injury to competition, remain substantially the same. Plaintiffs' request for a jury trial is therefore denied.

## 3. *The Summary Judgment Motions*

Before dealing with the individual counts in the complaints on which summary judgment is demanded, we set forth the standard to be applied in determining whether summary judgment is appropriate.

> "[T]he court's function upon a motion for summary judgment is not to resolve issues of fact, but to determine whether any material factual issues are raised after resolving all questionable inferences in favor of the party against whom the judgment is sought. Only if no material factual issues exist may summary judgment be granted. However, it is equally true that summary judgment should not be denied where the only issues raised are frivolous or immaterial ones which would simply serve to provide an exercise in futility or a purposeless trial for the district court, particularly where no jury has been demanded."

*United States v. Matheson*, 532 F.2d 809, 813 (2d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976).

Once a moving party has made a convincing presentation that no material fact is in dispute, the opposing party may not rest upon conclusory allegations and denials but must bring to the court's attention some affirmative indication that his version of relevant events is creditable. *Quinn v. Syracuse Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980).

■ With respect to the case before us, we note that several counts of the complaint, though based on different legal theories, are closely related in that the particular acts complained of (the barring of plaintiffs from defendant's premises and the mailing of the defamatory bulletin) would only create liability if done with wrongful or malicious intent. In its defense Miller asserts that the allegedly wrongful conduct resulted from a legitimate business decision to cease dealing with the Posas. The question of intent is not necessarily material to this defense, for although an act may be considered "legitimate" if taken in good faith and without malice, it may also be considered legitimate if absolutely privileged. Where a "qualified privilege" is asserted as a defense, the privilege may be overcome by plaintiff's affirmative showing of wrongful intent, however, if the privilege is absolute the question of intent is not relevant.

Although caution should be exercised in granting summary judgment in cases where a party's motivation is at issue, "the existence of undisputed facts can provide adequate basis for rejecting a claim of improper motivation for a defendant's action." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985). "If, after pretrial discovery the court is convinced as a matter of law that the suit could have only one possible outcome, summary judgment must be granted." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984).

### 4. *The Tortious Interference Claims*

We begin our discussion of the substantive issues with Counts III–V of the amended complaint which state closely related claims for tortious interference with contract and with business relations. The alleged wrongful conduct consists of Miller's barring of the Posas' trucks from its premises with the intent of interfering in the Posas' shipping contracts and advantageous business relations with the Miller distributors.

In dealing with claims of this type New York has adopted the approach and analysis set forth in the Second Restatement of Torts (1977) ("Restatement"). *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). The elements of both torts are very similar. One is liable for interference with contractual relations who "intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract." Restatement § 766. Liability for interference with business relations not cemented by contract likewise attaches where the interference is "intentional and improper." *Id.* § 766B. The distinction between contractual and non-contractual business relations lies in the greater protection that is afforded an interest in an existing contract than to a less substantive, more speculative business relationship. *See Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp., supra,* 50 N.Y.2d at 191, 428 N.Y.S.2d at 633, 406 N.E.2d at 449. Thus interference with a business relationship not amounting to contract is only actionable if unlawful means are used or if the motive for the interference is solely to harm the plaintiff. *See Beardsley v. Kilmer,* 236 N.Y. 80, 140 N.E. 203 (1923).

Even if one intentionally interferes with a contractual or business relationship of another, one may be privileged to act in such a manner and thus cannot be held liable. "Procuring the breach of a contract in the exercise of an equal or superior right is acting with just cause or excuse, and is justification for what would otherwise be an actionable wrong." *Felsen v. Sol Cafe Manufacturing Corp.,* 24 N.Y.2d 682, 687, 301 N.Y.S.2d 610, 613, 249 N.E.2d 459 (1969). As explained in the Restatement, privileged interference is not "improper" because the balance of competing values in a particular situation weighs more heavily on the side of allowing the interference. *See* Restatement § 767 comment b.

The Restatement supplies guidance to the balancing process by setting forth the

factors to be considered in determining whether the alleged interference is improper. These factors include: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, (g) the relations between the parties. *Id.* § 767. However, a court need not go through this balancing process afresh for every case; once a more or less crystallized rule or privilege has been developed a court may simply apply it to the facts presented. *See id.*, comment j.

Miller asserts that its conduct in barring plaintiffs' trucks from its premises is privileged and not improper. There are two well established privileges or rights that protect Miller from liability for the harm suffered by plaintiffs. First, and perhaps too obvious to bear repeating, is the fundamental right of a property owner to exclude others from his property. *See Village of East Rochester v. Rochester Gas & Electric Corp.*, 289 N.Y. 391, 399, 46 N.E.2d 334 (1943); *see also Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 431, n. 12, 58 L.Ed.2d 387 (1978) ("One of the main rights attaching to property is the right to exclude others.") Second, and perhaps equally well established, is the right to freely select those with whom one will do business. "It is the well settled law of this State that the refusal to maintain trade

relations with any individual is an inherent right which every person may exercise lawfully, for reasons he deems sufficient or for no reasons whatever, and *it is immaterial whether such refusal is based upon reason or is the result of mere caprice, prejudice or malice.*" *Turner Construction Co. v. Seaboard Surety Co.*, 98 A.D.2d 88, 469 N.Y.S.2d 725, 727 (1983) (emphasis added).

Balanced against these fundamental rights is plaintiff's "right to pursue one's business, calling, trade, or occupation, or the reasonable expectancy of a contract." *Royal Farms, Inc. v. Minute Maid Co.*, 37 Misc.2d 875, 236 N.Y.S.2d 368, 370 (1962).[3] Under the circumstances of this case we find the balance weighs clearly in favor of the defendants.

In order for plaintiffs to prevail, recognition would have to be given to some right of access, however qualified, for plaintiffs' trucks to come onto Miller's premises. The privilege of a property owner to arbitrarily exclude others, or of a business enterprise to freely choose those with whom it will deal, may be qualified when its exercise is seen to interfere with other interests the protection of which is deemed to be paramount. One example is society's interest in a free and competitive marketplace. This area has come to be governed by the laws of anti-trust.[4] Of course the right to be free of racial discrimination is a value of Constitutional dimension. Also, if a property or business owner's property or enterprise is affected with a public interest, the right to deny access or to refuse to deal

---

**3.** Plaintiffs admit that as common carriers they were prohibited by law from having long term contracts with its customers. *See* New York Transportation Law § 2(15) & (17), § 166 (McKinney 1975). The only contracts alleged to have been interfered with consist of particular orders for shipments of beer placed by the distributors prior to April 25. Assuming that such pending orders existed, the record contains no evidence of whether they were contracts and not agreements terminable at will, and if contracts, whether any were breached. These are all elements which it is plaintiffs' burden to establish. *See Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp., supra,* 50 N.Y.2d at 193, 428 N.Y.S.2d at 633, 406 N.E.2d at 450 (contract terminable at will classified as a

mere "expectancy"). Even if there were such breaches, there could not have been many, given the fact that distributors would only order beer deliveries a week in advance (see Pl.Mem. in Opp. p. 11) and the fact that more than a week elapsed between the announcement of the shut-out on April 25, and its going into effect on May 4. The center of gravity of plaintiff's tortious interference claim is thus for interference in advantageous business relations which, as has been discussed above, requires a stronger showing of wrongful conduct on the part of defendant.

**4.** Plaintiffs' anti-trust claim is treated *infra.*

may be limited. Thus it was held that the owner of a public stockyard could not without reasonable justification deny access to an employee of a livestock trader. *Carnes v. St. Paul Union Stockyards Co.,* 164 Minn. 457, 205 N.W. 630 (1925). Similarly, the owner/operator of a racetrack, which is a state granted monopoly, may not arbitrarily exclude a horse trainer from its premises. *Jacobson v. New York Racing Association,* 33 N.Y.2d 144, 350 N.Y.S.2d 639, 305 N.E.2d 765 (1973). Conversely, in a case closely analogous with this one, the operator (who as a lessee had the same possessory rights as the owner) of a private banana terminal was held to be absolutely privileged to exclude plaintiff truck driver from its premises, even though as a result plaintiff lost his job with his employer, a shipper, whose trucks had to come onto the premises in order to pick up or discharge their loads. *Standard Fruit & Steamship Co. v. Putnam,* 290 So.2d 612 (Miss.1974). In another closely analogous case, *Landess v. Borden, Inc.,* 667 F.2d 628 (7th Cir.1981), a milk hauler, whose business was to collect milk from a number of dairy farms and deliver it to a processing plant owned by Borden, Inc. and who was denied access to the plant, sued Borden for tortious interference with his contractual and business relations with the farmers. Defendant's motion for summary judgment was granted by the district court and affirmed by the circuit court, which held that Borden's conduct was privileged. *Id.* at 632.

Another line of cases indicates that a property owner's privilege to exclude others may be qualified where he has already ceded some of his possessory rights to tenants. *See Federal Waste Paper Corp. v. Garment Center Capitol, Inc.,* 185 Misc. 818, 57 N.Y.S.2d 200 (1945) (landlord may not arbitrarily deny access to a waste collector who needed to come onto the premises in order to service his customers who were tenants in the building); *accord Morra v. Hill,* 103 N.H. 492, 175 A.2d 824 (1961). This principle is inapposite here since Miller has not ceded any of its possessory rights to tenants.

No complaint has been made that Miller attempted to prevent anyone other than its own customers from engaging in business relations with plaintiffs. Nor is there any claim made that even these customers were prevented from dealing with plaintiffs on any business that did not involve bringing their trucks onto the premises of the Fulton brewery. The means employed by Miller, shutting its gates to plaintiffs' trucks, was not unlawful. We therefore conclude that defendant's conduct in barring plaintiffs' trucks from its premises is absolutely privileged and that it is entitled to summary judgment on Counts III–V of the amended complaint.

### 5. *The Libel Claim*

The claim of libel rests on allegedly false and defamatory statements contained in the bulletin Miller sent to the distributors on April 25, notifying them of its decision to bar the Posas from its premises, and in the May 21 letter to one of the distributors answering an inquiry as to the reasons for that decision. Plaintiffs claim that the statements contained in the bulletin and letter falsely implied that the Posas were not reliable haulers who were willing "to comply with reasonable rules and regulations." Defendant asserts that it is entitled to summary judgment on the libel count offering three grounds: (1) that the defamatory statements were true; (2) that Miller had a qualified privilege to communicate this information to the distributors; and (3) that plaintiffs' injuries were not caused by the defamation.

We begin with a discussion of privilege since "the defense of truth arises only in the event that it is determined that the defense of privilege does not apply." *Laurence University v. State,* 68 Misc.2d 408, 326 N.Y.S.2d 617, 626 (1971), *rev'd on other grounds,* 41 A.D.2d 463, 344 N.Y.S.2d 183 (1973). A qualified privilege attaches to communications that are "fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his own offices in a matter where

his interest is concerned." *Toker v. Pollak,* 44 N.Y.2d 211, 219, 405 N.Y.S.2d 1, 5, 376 N.E.2d 163, 166 (1978). Statements thus privileged are not actionable so long as expressed "in a reasonable manner and for a proper purpose." *Id.* To overcome the privilege plaintiff must prove that the communication was not made in good faith but rather was motivated by actual malice, ill will, personal spite or culpable recklessness or negligence. *Stillman v. Ford,* 22 N.Y.2d 48, 53, 290 N.Y.S.2d 893, 897, 238 N.E.2d 304, 306 (1968). A defendant is entitled to summary judgment where a qualified privilege has been demonstrated and the plaintiff offers an insufficient evidentiary showing of actual malice. *Trails West, Inc. v. Wolff,* 32 N.Y.2d 207, 221, 344 N.Y.S.2d 863, 873, 298 N.E.2d 52, 60 (1973).

■ New York clearly gives the protection of a qualified privilege to statements made by a defendant to a third party on matters relating to their mutual business interests. *See e.g., Commonwealth Motor Parts Ltd. v. Bank of Nova Scotia,* 44 A.D.2d 375, 355 N.Y.S.2d 138, *aff'd,* 37 N.Y.2d 824, 377 N.Y.S.2d 482, 339 N.E.2d 888 (1974). The defamatory communications at issue here were made by Miller after it had determined that it would no longer allow the Posas' trucks on its premises. It was obviously essential for Miller to communicate this fact to its distributors. However, the bulletin contained more than a bare announcement of the fact that relations with the Posas were to be terminated. Plaintiffs claim that they were defamed by statements in the bulletin falsely impugning their "reliability" and "willingness to follow reasonable rules and regulations."[5] Clearly Miller had some sort of duty, be it only moral or social, to give some explanation to its distributors as to why it was terminating relations with the Posas. Indeed, one distributor subsequently wrote Miller asking for a fuller explanation. Mil-

ler's response was essentially to republish the April 25 bulletin in its May 21 letter to the distributor. We note the careful wording of the communications. They do not go so far as to state flatly that the Posas are unreliable or are lawbreakers but rather have a subjective tone, i.e., that as far as Miller's own experience with plaintiffs, their reliability and willingness to comply with regulations had not been "demonstrated." Taken in this subjective sense the statements would only be false if such was not in fact Miller's experience or state of mind.

■ Plaintiffs strenuously contest the issue of defendant's good faith, however, we must decide whether they have made a sufficient evidentiary showing to resist defendant's motion for summary judgment. Miller's contention that it reasonably believed the defamatory statements to be true is amply supported in the record. This evidence consists of: the inter-office memo dated September 13, 1978 (over a year and a half before the communications at issue here) indicating Miller's belief that Posa, Inc. had been making illegal hauls (Pl.App. Doc. No. 6568); the memo of December 15, 1978 advising Miller personnel to discontinue using Posa for illegal hauls (Def.Mem. Ex.C); the memo of January 15, 1979 discussing the complaints from other shippers about improprieties involving the Posa operations at the brewery (Pl.App.Doc. No. 6406); the memo dated January 16, 1979 discussing complaints about Posa from various distributors (Pl.App.Doc. No. 6408); the letter dated June 4, 1979 from the DOT to the Posas, of which Miller was sent a copy, informing them that a DOT investigation revealed they were operating unlawfully (Def.Mem.Ex.F); Miller's explanation to its traffic manager that among the reasons for firing him was his participation with Posa in illegal activity (Aff. of Richard

5. The portions of the April 25 bulletin containing the alleged defamation are worded as follows:

Listed below are the names of specialized beverage haulers serving our Fulton facility who have demonstrated their reliability and

their willingness to comply with reasonable rules and regulations.... You will note that J. Posa, Inc. and Posa, Inc., currently serving the Fulton facility, are not listed below. Accordingly they will not be permitted on Company property after 12:01 a.m., May 4, 1980.

Zarski, 12/20/79, Pl.App.Ex. 27); Miller's awareness of the DOT order of October 26, 1979 instituting an investigation into the Posas' operating practices, of the lawsuit brought by the DOT against the Posas for numerous violations of the Transportation Law, and of the settlement of this case requiring the Posas to pay $12,000 in fines and to make reimbursement for 504 overcharges. (Aff. of Raymond Jones, 5/25/80, ¶ 7, 8, 9 and 10, Def. Mem. Ex. B).

As for an evidentiary showing that Miller's statements were motivated by actual malice, plaintiffs offer little more than their own unsupported assertions. At most plaintiffs contend that Miller acted recklessly in not discovering before sending out the offending bulletin that the DOT had exonerated the Posas of any wrongdoing. (Pl.Mem. in Opp. p. 40). While it is true that as part of his decision granting an extension to the Posas' operating authority the ALJ noted that the administrative proceeding instituted on October 26, 1979 was withdrawn, this decision does not have the effect of exonerating the Posas from all wrongdoing.[6] Nor does the court ordered settlement of the DOT's civil suit, pursuant to which the Posas were ordered to pay a $12,000 fine and to make reimbursement for 504 overcharges exonerate them. It is to be noted that the issue of whether the Posas did in fact make illegal hauls was subsequently litigated in New York State Supreme Court. In *Posa, Inc. v. Spartan Beverage Corp.*, No. 285481 (N.Y.Sup.Ct.1982) (Def.Mem.Ex.N) the court determined as a fact necessary to its judgment that Posa, Inc. had made unauthorized shipments of beer from the Riverside warehouse to a distributor. Although

Miller was not aware of this judicial determination at the time it sent the defamatory bulletin, the finding that the Posas did in fact engage in making unauthorized hauls is nonetheless highly probative of the issue we are concerned with here—whether Miller held a bona fide belief that the Posas had failed to comply with governmental regulations.[7]

In conclusion, based on the record before us, we find that a sufficient evidentiary showing has not been made to defeat the qualified privilege and that defendant is therefore entitled to summary judgment on Count I of the complaint.

### 6. The Anti-Trust Claims

In their amended complaint plaintiffs have deleted paragraphs 65–74, making up Counts XI and XII, which alleged a violation of § 1 of the Sherman Act by means of a group boycott and/or concerted refusal to deal. These have been replaced with paragraphs 65.1–71.3 which allege a violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and New York State's anti-trust statute, the Donnelly Act, N.Y.Gen.Bus.Law § 340 et seq. (McKinney's 1968) by conduct characterized as an unlawful tying arrangement.

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958). Tying arrangements are harmful to competition in that competitors are

---

**6.** This decision was not approved by the DOT until April 29, 1980, four days after the bulletin was sent to the distributors.

**7.** Plaintiffs also contend that these violations of the Transportation Law were mere technicalities, or that they were in a "grey area" (see Pl. Mem. in Opp. p. 29) however, this goes more to the question of whether Miller had reasonable grounds to cease relations with them. We have found that Miller was privileged to refuse to deal with the Posas for any reason or for no reason, thus, whether the violations were actual-

ly as minor as defendant's claim is not really a material issue. Also there is the implication in plaintiffs' submissions that they were victimized by a conspiracy among its competitors who, motivated by jealousy at the Posas' success, and by desire to do away with a more efficient competitor, orchestrated a campaign of false accusations and other improper means to get Miller to cut them off. To this we simply note that none of these competitors are parties in this action.

denied free access to the market for the tied product, "not because the party imposing the tying requirements has a better product or a lower price, but because of his power or leverage in another market." *Id.* at 6, 78 S.Ct. at 518. In order to establish an illegal tying arrangement plaintiff must demonstrate: (1) two distinct products or services (tying and tied) are involved; (2) evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product; (3) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; (4) anti-competitive effects in the tied market; (5) involvement of a "not insubstantial" amount of interstate commerce in the tied product market. *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 56–57 (2d Cir.1980). There is a sixth element to the test—that the seller of the tying product have some degree of economic interest in the market for the tied product—which has been adopted by many of the circuits. *See Carl Sandburg Village Condominium Association v. First Condominium Development Co.,* 758 F.2d 203 (7th Cir.1985) (compiling cases so holding from theThird, Fourth, Fifth, Sixth, Seventh, Ninth and Eleventh Circuit Courts of Appeal). While the Second Circuit has not expressly adopted this element of the test, it has expressed its approval. *See Yentsch v. Texaco, Inc., supra,* 630 F.2d at 57, n. 15. Additionally, this court has itself recognized the economic interest element in a prior case. *See Esposito v. Mister Softee, Inc.,* 1980–1 Trade Cas. (CCH) ¶ 63,089 at 77,423–24 (E.D.N.Y. Dec. 14, 1979), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed. 687 (1984). The rationale for this economic interest requirement is that where the seller of the tying product has no economic interest in the sale of the tied product he is not using his power in the tying product market to invade a second market, which is the conduct the proscription on tying arrangements is designed to prevent. *See Carl Sandburg Village, supra,* 758 F.2d at 208.

The tying claim presented here is that Miller used its "dominant position in the market for brand name nationally distribut-

ed beer" (Amended Complaint ¶ 66.7) to foreclose competition in the market consisting of "common carrier trucking companies licensed to haul beer from Miller's Fulton brewery and other Miller breweries." (*Id.,* ¶ 67.1). Put another way, the alleged violation consists of Miller's "coercion" of its distributors to use only those common carrier trucking companies approved by Miller. (*Id.* at ¶ 66.8). This tying claim is rather unorthodox, and defendants raise numerous arguments why they should be granted summary judgment on these counts of the complaint. We do not think extended discussion of all the points raised is necessary since there are clearly fatal flaws with respect to several elements of plaintiffs' case in chief.

▮ It is sufficient for purposes of dismissing the tying claim to note that it has not been alleged, nor is there a trace of evidence in the record to indicate, that Miller had any economic interest in the alleged tied market. The sixth element that plaintiffs must prove in order to establish an illegal tying arrangement is thus entirely missing.

▮ Plaintiffs' claims with respect to the other elements necessary to prove a tying arrangement are also seriously deficient. For example, to make out the first element plaintiff must establish the involvement of a tied and a tying product. Here, there is no particular tied product that is being "forced" on the distributors. Rather, the claim is that the sale of the tying product, beer, was conditioned on the distributors *not* using a particular supplier in the tied market. Plaintiffs characterize this as a "negative" tying arrangement (Pl.Mem. in Opp. p. 59) in that the distributors remained free to use any of the carriers authorized to service the brewery except the Posas. Plaintiffs have not cited any case authority for the proposition that such a negative tie is unlawful, moreover, it seems that in such a case the pernicious effect on competition in the tied market becomes rather speculative. This is especially true in the instant case where, by

plaintiffs' own admission, there were approximately 37 common carrier trucking companies authorized by the DOT or ICC to haul beer from the Fulton brewery (Amended Complaint ¶ 66.3).

 Even if plaintiff fails to make a sufficient showing to establish a tying arrangement which is unlawful per se, he still "can prevail on the merits whenever he can prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 500, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969); *see also Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 1567, 80 L.Ed.2d 2 (1984). However, in *Carl Sandburg Village, supra,* the Seventh Circuit has held that regardless of whether the claim is based on a tying arrangement that is unlawful per se, or one that falls afoul of the rule of reason, plaintiff must establish that the tying seller has an economic interest in the sales of the tied product. 758 F.2d at 210. The underlying rationale for this requirement, that without an economic interest in the tied product there is no danger that the tying seller will acquire market power in the tied product market, applies equally well when a claim is brought under the rule of reason. *Id.* Another way to understand this requirement is that where there is no economic interest in the market for the tied product it is difficult to infer an improper purpose on the part of the tying seller.

Even if we were not to follow *Carl Sandburg* on this issue, there are other clearly apparent reasons why plaintiffs fail to present an adequate claim that the general standards of the Sherman Act have been violated. In determining whether these standards have been violated, among the most important circumstances to be considered are those relating to the competitive characteristics of the relevant mar-

ket. Proof that defendant's activities had an impact upon competition in a relevant market is absolutely essential. *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 70 (2d Cir.1984). Before any assessment can be made of whether a defendant's actions have had any anti-competitive effects, the boundaries of the relevant market must be understood. *Id.*

 Although there is some dispute here as to the boundaries of the relevant market, for purposes of deciding defendant's motion for summary judgment we accept plaintiffs' definition of the relevant market as being that for "common carrier trucking companies licensed to haul beer from the Fulton brewery." Even accepting this rather restrictive definition of the relevant market,[8] plaintiffs have failed to present evidence sufficient to create a genuine fact issue as to any anti-competitive effects in that market. The complaint asserts plaintiffs' belief that there were approximately 37 participants in this market during 1979 and 1980 (Amended Complaint ¶ 66.3). The list that Miller circulated to its distributors along with the April 25 bulletin contains at least 35 common carriers with authority to service the Fulton brewery (Pl.App.Doc. No. 7808–13). No evidence has been offered as to the nature of the harm to competition, whether it be increased prices, monopolization, or anything else, resulting from defendant's conduct.

It has been repeated so often as to have become a commonplace that the anti-trust laws are designed for the "protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Plaintiffs here have done nothing more than establish the elimination of a single competitor from the market. It is therefore our conclusion that plaintiffs' claim that Miller violated the Sherman Act by unlawfully tying the sale of beer to the non-use of a particular common carrier trucker does not withstand defendant's mo-

---

**8.** We see no clear reason why at the very least rail shippers and distributors who do their own

shipping should be excluded.

tion for summary judgment, whether the violation claimed is unlawful per se or under the rule of reason.

Plaintiffs' Donnelly Act claim is grounded on the identical occurrences that support the Sherman Act claim and we reject it for the same reasons. The Donnelly Act, N.Y. Gen.Bus.Law § 340, was modeled on the Sherman Act and claims under both are treated to the same type of analysis. *See State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 381 N.Y.S.2d 426, 344 N.E.2d 357 (1976). While the sweep of the Donnelly Act may be broader than the Sherman Act (*Id.* at 464, 381 N.Y.S.2d at 428, 344 N.E.2d at 359), there is no indication that the New York courts would treat a claim in the nature of that presented by instant plaintiffs any differently under the Donnelly Act than would be done under the Sherman Act. *See e.g., Columbia Gas of New York, Inc. v. New York State Electric & Gas Corp.*, 28 N.Y.2d 117, 320 N.Y.S.2d 57, 268 N.E.2d 790 (1971) (applying Sherman Act cases); *see also R & G Affiliates, Inc. v. Knoll International, Inc.*, 587 F.Supp. 1395, 1405–06 (S.D.N.Y.1984) (identical analysis applied to tying claim under both statutes).

The New York cases cited by plaintiffs do not persuade us that the Donnelly Act compels a different result than we have reached under the Sherman Act. In *Ambassador Construction Co. v. Durst Organization, Inc.*, 82 A.D.2d 767, 440 N.Y.S.2d 215 (1981), plaintiff was a contractor who had submitted a bid to do some construction work for a tenant on premises leased from defendant/landlord. The lease contained a clause requiring that tenants use only contractors who had first been approved by the landlord. The defendant/landlord refused to allow plaintiff on the premises to do the work and the contract was subsequently awarded to landlord's in-house contractor. Plaintiff then sued for injunctive relief and damages under the Donnelly Act. The trial court's grant of summary judgment to the landlord was reversed by the Appellate Division in the cited decision. Although only a brief memorandum, it is nevertheless clear that

both the facts and procedural posture of that case make it significantly distinguishable from the case at bar.

If we take the landlord as analogous to Miller, the contractor to the Posas, and the tenant to the distributors, the following distinctions are apparent. First, the fact that the contract was awarded to its own in-house contractor shows that the landlord had an economic interest in competing with plaintiff in the tied contracting market, whereas Miller had no economic interest in competing with the Posas in the trucking market. The absence of economic interest is one of the grounds upon which we have granted summary judgment to Miller. Second, a showing of anti-competitive effect in the contracting market had been made since plaintiff's bid was lower than the bid submitted by the landlord's firm to whom the contract was awarded. In the instant case, another basis for our decision is our finding that no showing has been made of anti-competitive effects in the trucking market. Third, with respect to the procedural posture, in the state case the trial court had granted summary judgment early in the proceedings, before important discovery had taken place, whereas, in the instant case over four years have elapsed since its filing and discovery has been completed (from which voluminous excerpts have been submitted to the court). We therefore conclude that *Ambassador Construction* does not indicate that the instant case would receive a different disposition under the Donnelly Act than we have given it under the Sherman Act. The other case cited by plaintiffs, *Atlantic-Inland, Inc. v. Town of Union*, 126 Misc.2d 509, 483 N.Y. S.2d 612 (1984), is completely inapposite. In that case a town ordinance granting a monopoly on electrical inspection services was held to be violative of the state Constitution and the Donnelly Act. The entire bulk of the decision deals with the constitutional issue, but, suffice it to say, the instant case does not involve a monopoly.

Count XIII of the original complaint states a Sherman Act claim which does not arise out of the same events we have been

discussing thus far, rather, it involves an alleged conspiracy between Miller and others to drive the Posa family's warehousing operation, Riverside Warehouse, Inc., out of business. Counts XI and XII of the original complaint which alleged Sherman Act violations in the nature of a conspiracy were deleted in the amended complaint, to be substituted with the tying claims. We think it more than mere speculation to suppose that the reason the conspiracy claims were dropped was probably because even upon the conclusion of discovery plaintiffs were unable to come up with sufficient substantiation for the claims. The conspiracy allegations in Count XIII, however, are not mentioned in the amended complaint, and thus appear to survive unaltered. What gives us pause though is that nowhere in plaintiffs' extensive memorandum arguing the merits of the instant motions is any mention made of the allegations in Count XIII. This would ordinarily lead us to conclude that the claim was abandoned, and the fact that it was not deleted in the amended complaint an oversight, however, mention *is* made of the allegations in plaintiffs' counterstatement of "material facts as to which it is contended that there exists a genuine issue to be tried," which was submitted in accordance with Local Rule 3(g) at the same time as their memorandum.

Assuming, then, that the claim was not abandoned, we examine, as best we can, the evidence submitted substantiating the alleged conspiracy. Defendant has asserted that it ceased dealing with Riverside in late 1979 unilaterally and for legitimate business reasons. (See Aff. of Warren J. Klien, 5/20/85, Def. Mem. Ex. A). Of course, independent action is not proscribed by the Sherman Act, thus, a manufacturer generally has the right to deal or refuse to deal with whomever it choses. *See Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). A plaintiff attempting to demonstrate the existence of a conspiracy must produce "evidence that tends to exclude the possibility that [the alleged conspirators] were acting independently." *Id.* 104 S.Ct. at 1471.

Plaintiffs would have us infer the existence of a conspiracy from the fact that Miller's cessation of relations with Riverside followed complaints made by their competitors. In *Monsanto*, the Court held that a manufacturer's termination of relations with a distributor following complaints from the distributor's competitors was insufficient to permit an inference of a conspiracy. " 'To permit the inference of concerted action on the basis of receiving complaints alone ... would both inhibit management's exercise of independent business judgment and emasculate the terms of the statute.' " *Id.* at 1471, *quoting Edward J. Sweeny & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111, n. 2 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

■ Plaintiffs allege that their competitors made those complaints at meetings with Miller. However, the mere fact that such meetings took place is insufficient to permit an inference that an illegal agreement was entered into. *See Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). Plaintiffs' principal, F. Joseph Posa, testified at a deposition that he believes that plaintiffs' competitors bribed a purchasing agent at the Fulton brewery (F.J. Posa Dep. p. 163, Def. Mem. Ex. L), however, no evidence has been presented to substantiate this belief, nor is there any indication that such evidence would be available at trial. We conclude that plaintiffs have failed to produce sufficient evidence tending to exclude the possibility that Miller acted independently in terminating its relations with Riverside Warehouse, Inc. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir.1985). Accordingly, defendant's motion for summary judgment on Count XIII is granted.

■ There is yet an alternate ground for granting summary judgment on this count. An alleged conspiracy or agreement is in violation of § 1 of the Sherman

Act only if anti-competitive in purpose of effect, as tested under the rule of reason. *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). As plaintiffs have not even attempted to show injury to competition in the market for warehousing services resulting from Miller's termination of relations with Riverside the claim is patently inadequate.

### 7. *The Contract Claims*

Counts VI–VIII, brought on behalf of Riverside Warehouse, Inc. allege the breach by Miller of several contracts relating to warehousing services. It appears that neither party has made a motion with respect to these counts thus they remain to be adjudicated at trial.

Count IX, brought on behalf of J. Posa, Inc., alleges breach of a contract for the rental by Miller of 18 trailers from plaintiff. Count X seeks recovery on an account stated in the sum of $25,530.12, allegedly due and owing on the trailer rental contract. Plaintiff has moved for summary judgment on these counts.

The alleged contract was an oral agreement whereby plaintiff agreed to obtain the trailers for use by Miller, in consideration of which Miller agreed to make reimbursement for the cost that plaintiff incurred in obtaining the trailers.[9] Miller denies the existence of this agreement, claiming that it has compensated plaintiff for its use of the trailers by payment of normal freight charges, and that plaintiff, by charging both for the use of the trailers and for the cost of obtaining them, is engaging in "double billing."

Plaintiff claims that the Miller employee who entered into the contract was the traffic manager at the brewery, Richard Zarski. A letter written by Zarski to J. Posa, Inc. dated October 26, 1979 (after Zarski had been fired by Miller) is offered in confirmation of the existence of the agreement. (Pl.App.Doc. No. 7963). De-

fendants point to letter dated July 25, 1979, denying the existence of this agreement. (*Id.* Doc. No. 7965). Obviously the testimony of the parties and/or witnesses to the alleged agreement is essential to a determination of its existence and/or terms. Defendant challenges the credibility of both witnesses, Zarski and F.J. Posa. As grounds for impeachment Miller claims that both are hardly disinterested, Posa for obvious reasons, and Zarski because he had a grudge against Miller stemming from his firing. "[I]f the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial." 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2776 (1983). It is therefore our conclusion that there are material issues of fact that remain to be resolved, thus, plaintiffs' motion for summary judgment on Count IX must be denied.

In order to recover on Count X plaintiff must prove that the account was presented, that its validity was acknowledged, and that defendant did not object to the accounts so stated. *See Milstein v. Montefiore Club of Buffalo, Inc.*, 47 A.D.2d 805, 365 N.Y.S.2d 301, 303 (1975). Plaintiff appears to have presented an account to Miller by sending an invoice dated July 6, 1979 (Pl.App.Doc. No. 6125). Miller appears to have objected to the bill by letter dated July 25, 1979 (*Id.* Doc. No. 7965). Plaintiffs' motion for summary judgment on Count X is therefore denied.

To sum up, in one place, what we have decided herein:

(1) Plaintiffs' request to amend their complaint is granted.

(2) Plaintiffs' request for a jury trial is denied.

(3) Defendant's motion for summary judgment on Counts I–V and XI–XIII of the amended complaint is granted.

---

**9.** The trailers were not plaintiff's but were rented by it from another source.

(4) Plaintiffs' motion for summary judgment on Counts IX and X is denied.

(5) The claims in Counts VI–X remain to be adjudicated at a forthcoming trial.

SO ORDERED.